DEVONIAN PRODUCTS COMPANY, Appellee, v. CLEMENT L. WEBSTER, Appellant.

**CORPORATIONS:** A corporation which issues its stock to one who is, in fact, an expert mineralogist, in consideration that such expert will perform for the company expert services in the science of mineralogy, may not, when such services are actually rendered, thereafter have the stock canceled, on the ground that the recipient of the stock was guilty, prior to the employment, of false representations *as to the manner in which he beeame such expert.*

*Appeal from. Floyd District Court.*—C. H. KELLEY, Judge.

MAY 15, 1920.

ACTION in equity to cancel certain shares of stock issued to the defendant, on the ground that they were fraudulently obtained. Decree for the plaintiff in the court below. Defendant appeals.—*Reversed.*

H. J. Fitzgerald, J. C. Campbell, and W. M. Brouillard, for appellant.

W. G. Henke, Dawley & Jordan, and H. L. Lockwood, for appellee.

GAYNOR, J.—This is an action in equity to cancel 20,000 shares of stock issued by the plaintiff company to the defendant. The par value of the stock was 25 cents per share. The stock was issued by the Interstate Investment & Development Company, the name of which was afterwards changed to the name in which this suit is brought. The prayer for the cancellation of the stock is based upon a claim that the same was procured by the defendant through false and fraudulent representations.

It appears that, some time in the early part of 1903, the defendant conceived the idea of organizing a company,

the object and purpose of which would be to prospect for, locate, purchase, lease, or otherwise acquire lands, mines, mineral claims, oil lands, coal mines, or any other property, to buy, sell, mortgage, and convey land or other property, and to do all acts necessary to the full carrying out of its object; that to this end he interested certain persons residing in and about Charles City, to wit, C. P. Leland, C. F. Morris, T. E. Hirsch, G. W. Von Berg, and C. E. Sheldon; that, in the conversations had with these people, he represented "that he was a professor of science, that he was a scientific expert of high standing in the scientific world, that he had a thorough knowledge of geology and mineralogy, and was scientifically acquainted with the possibilities of the west, and also that he had an acquaintance with mining methods and indications of ores, coal, oil, etc., and that such acquaintance and such knowledge as he possessed was equal to that possessed by any other man, that he was a graduate of the universities of high standing, that he had completed in universities of high standing the course required in the development of a mining engineer and geologist, that he had completed in universities and colleges of high standing the work required by the curriculum as preliminary to the bestowal of the degree of Master of Science." It appears that these parties became interested in the proposition, and thereafter organized themselves into a corporation, the object and purpose of which, as recited in the articles of incorporation, was "to prospect for, locate, purchase, lease, or otherwise acquire lands, mines, mineral claims, oil lands, coal mines, or other property, and to buy, sell, mortgage, and convey lands or other property, and to do all acts necessary to the full carrying out of that project." The capital stock was fixed at $50,000, divided into shares of 25 cents each, par value. The place of business was fixed at Charles City. The articles provided for a president, first and second vice-president, secretary and treasurer, and a scientific expert

and board of directors. The corporation was to commence on June 15, 1903, and continue for 20 years. The articles of incorporation were signed by the defendant and the parties hereinbefore named. These articles were subsequently amended. In the amendment appears the following:

"This corporation shall have the right to develop and conduct its own properties in ways it may deem most advantageous and proper, manufacture and develop its products and sell and dispose of the same, plan town sites near the work, erect buildings, develop new power sites, and do all other things permitted by law to be deemed best and most advantageous in developing, working, and maintaining its properties."

The amendment also gave to the corporation the right to borrow money, to sue and be sued, to appoint executive and other committees, with full power to act, to make contracts and transfer property, possessing the same powers in such respects as natural persons. The amendment also provided for the increase or decrease of stock at any annual meeting of the stockholders, or at any special meeting called for that purpose, and provided further that the affairs of the corporation should be conducted by a board of five directors, to be elected by the stockholders. This last was filed for record on the 17th day of October, 1910.

After the incorporation was effected, the board of directors of the company entered into a contract with the defendant, who was not then a stockholder or an officer of the company, by which it undertook and agreed that, in consideration of his giving to the company his services for a period of 10 years as a scientific expert, he should receive for such services 20,000 shares of the stock of the corporation, together with a salary of $3.00 per day, and expenses while away from home in the service of the company. It appears that, thereafter, Webster entered upon his duties as scientific expert, and continued in that position up to the

time of the commencement of this action; that, thereafter, the plaintiff paid him his salary and expenses provided for in the contract, and, on the 12th day of March, 1904, issued to him 115 shares of its stock, and later, on the 24th day of January, 1907, issued to him the balance of the 20,000 shares. This is the stock involved in this suit. Thereafter, the plaintiff proceeded with its corporate business, and elected officers, from time to time, and boards of directors, to whom the management and control of the corporate business were confided. The business of the corporation seems to have been conducted under an exaggerated idea of undiscovered possibilities. It acquired some real property, built some buildings, and prepared itself for the exploitation of the great enterprises in which it had embarked. It issued a circular, in which it said:

"We propose to send our scientific expert throughout the mining districts of the west, to locate under the laws of the United States desirable claims, water rights, mill sites, town sites, quarries, oil lands, timber lands, etc.; to take options on valuable properties of all kinds and sell them, to find purchasers for such property and enter lands, sell claims. And by thus diversifying our business we make it a sure success, with quick and ample returns. The great west is yet a new country, with measureless possibilities. Discoveries are being made every day of its vast wealth, and it is our purpose to unlock some of the treasure doors and to share in the wealth that lies yet hidden. Many companies have located rich mines, and for the lack of capital have been compelled to abandon them or to barely hold them down. * * * We propose to get options from the bankrupt owners and sell to the moneyed companies, and make, thereby, large profits with little investment. It is believed that very soon the dividends will materially assist in the payment for stock. The purchaser will draw dividends on the amount of stock subscribed. It is impossible to state

just when dividends will be paid. It is to be hoped very early," etc.

It does not appear definitely by whom this circular was prepared or issued. We take it, however, that it was issued by authority of the company. The same names appear at the head of the circular that appear in the articles of incorporation. It does not appear just when this circular was issued, but, we take it, soon after the corporation was organized, and while the original incorporators were officers of the company. The principal part of plaintiff's business, after its organization, seems to have been the selling of stock. One of the original incorporators testified for the plaintiff that, at the first meeting, May 7th, after the incorporation:

"We were willing to share in any scheme that would bring in quick and ready returns. At the second meeting, we paid in $10 apiece, to get in on the ground floor, and for the purpose of getting incorporation papers. At that time, we were all looking out for our interests, and not for the interests of the stockholders. We had a meeting on June 25, 1903, and the principal talk at that meeting was to get the scientific expert out for some proposition that we could make money out of. Our scheme was not to take over developed properties; but, if Mr. Webster discovered valuable property, we would lease it and take an option on it. We told Mr. Webster to go out and see what he could find. He went, and reported back that he had discovered some sage brush potash. [It appears, however, that nothing came of this.] I don't recall that the board gave Mr. Webster any directions as to research, other than this testified to. I don't remember Mr. Webster's ever refusing to do as the board directed. Mr. Webster did not ask for the last issue of stock until 1907. On January 4, 1907, the board voted to issue to the defendant the balance of the 20,000 shares, 115 shares having been issued on March 12, 1904. The same was issued in consideration of services rendered to the company in

the amount of $5,000, being the par value of the stock.   I
was secretary at the time.   We first decided that we didn't
need the services of the scientific expert after Mr. Webster
opposed a deal contemplated between the plaintiff and a
company known as the Radio Company.   Mr. Webster
never declined to act as scientific expert, up to the time we
discharged him.   The statements of Webster as to
his qualifications and training were made sever-
al months prior to the organization of the com-
pany.   I don't remember that Mr. Webster made any state-
ments concerning his education or qualifications at the board
meeting at the time the company entered into the contract
with him under which he was to receive the 20,000 shares
of stock.   The contract under which he was to receive these
shares was presented at the meeting by either Hirsch or Le-
land.   It was read and voted on.   Mr. Webster said noth-
ing about the contract at the meeting.   Mr. Leland had more
to do and say than any of the others at the meeting, and he
was the ruling hand of the corporation.   Mr. Webster never
had much to say at the meetings.   Leland and Hirsch talked
very strongly 'easy money,' when the corporation was organ-
ized.   We all entered into it with the idea of getting easy
money."

Touching the making of the contract with the defend-
ant, we quote from the minutes of the meeting of June 4,
1903:

"The organizers all met in regular meeting, first discuss-
ing the work of the scientific expert and the conditions under
which he is to work.   The following points were agreed up-
on: The present scientific expert, C. L. Webster, shall re-
ceive, without cash consideration, 20,000 shares of our capi-
tal stock, also $3.00 per day and all necessary expenses of
travel, transfer, board, and lodging, while actually employed
in the business of the company.   In return for this, the said
Webster shall give his full time and his best efforts for the

promotion of the company's interests, in that he shall fully employ his time and strength in finding and securing, *under the direction of the board of directors,* valuable mineral properties of various descriptions, such as gold, silver, copper, iron, or coal mines, oil lands, and any other property whatsoever; that he shall seek to interest parties in properties heretofore named, with a view of selling said properties at the greatest possible profit to the said company. In doing this work, it is understood that the said expert shall ordinarily only act *under the orders of the board of directors,* though exceptional cases may arise when it will be necessary to act without delay, and this shall be allowed him if, in his judgment, there is but one profitable course open in the premises. Regular reports of his work shall be forwarded by him to the secretary. It is also understood that the said Webster shall give his whole time under this contract for the period of 10 years, *provided he is annually reelected to his office at the regular election as provided by the by-laws of the company.*"

One of the officers of the company testified:

"Mr. Webster went out west, and reported a potash proposition and some mining propositions and a summer resort out in the mountains. None of these propositions were tangible. There was an attempt made to sell the potash proposition, but it was not put in such form as to make it tangible, and nothing ever came of it. At the time we sent him out, Mr. Webster's scientific ability and $85.00 was all there was to the company. Mr. Webster wrote us, when he was out west, as to what he was doing. We considered it best to try and sell the potash proposition. Went to Chicago for that purpose."

Another witness testified that, prior to the issuance of the stock to him, the defendant had submitted to the company propositions that had been accepted, and the potash proposition, which they tried. He had submitted a great

many propositions. "A number of the propositions were too far away for us to investigate." This witness testified further:

"From 1903 to 1907, Mr. Webster proposed numerous propositions of mines and oil wells; but we never got down to details, for the simple reason that, after we got hold of the Lothograph City property, we felt that something should first·be done with that, before we took up anything else."

We have set out so much of the record, and only so much of the record, as we think material to be considered upon the issues tendered. The argument in this case has taken a much·wider range than the issues presented justify. Evidence was introduced and argument has been made, based upon evidence introduced, that is not relevant to the issues as they stand and stood at the time of this trial. As said before, this action is brought to cancel the stock hereinbefore referred to, issued to the defendant under the conditions shown in this record. The sole ground upon which cancellation is asked, is that the defendant, when seeking to interest the parties in the scheme which finally culminated in the organization of the corporation, stated to these parties who subsequently became the incorporators:

"That, previous to the formation of this corporation, and for a long period of time thereafter, and down until the present time, the defendant was representing to the directors and stockholders of this corporation that he was a professor of science; that he was a scientific expert of high standing in the scientific world; that he had a thorough knowledge of geology, a thorough knowledge of mineralogy, and was scientifically acquainted with the possibilities of the west; and also that he had an acquaintance with mining methods and indications of ores, coal, oil, etc.; and that such acquaintanceship and such knowledge as he possessed was equal to that possessed by any other man; also, that he was a graduate of the universities of high standing; that

he had completed, in universities of high standing, the courses required in the development of a mining engineer and geologist; that he had completed in universities and colleges of high standing the work required by the curriculum as preliminary to the bestowal of the degree of Master of Science."

The right to cancel this contract is predicated on the sole ground that the representations herein set out were not true; that the defendant was not an expert mineralogist; that he did not have a thorough knowledge of geology and mineralogy; that he was not acquainted with the possibilities of the west; and that he had no acquaintance with mining methods by which ores, coal, oil, etc., could be ascertained. We may concede, for the purposes of this case, that the defendant made these statements; that he was not a graduate of any university; that he had not taken the course required in the development of mining engineers and geologists; that he had not completed in any university or college the work required by the curriculum as preliminary to the bestowal of the degree of Master of Science: yet we cannot concede that he was not a practical expert in these lines. The question that concerned his employers did not depend upon the source from which he acquired his knowledge, so much as it did upon the fact of knowledge. It is true that colleges and universities teaching these branches of science enable a student to more quickly acquire the fundamentals upon which to build, but the building process is purely personal, and may be acquired and possessed without the aid of these institutions. When one has the aptitude, the industry, access to books of learning upon these branches, and practical experience, he may become expert in these lines without the aid of these institutions. Resort may be had to

"Those ancient teachers, never dumb,
"Of nature's unhoused lyceum."

We do not think the record would justify us in saying that this man did not have the capacity, the qualifications,

the learning, and the ability to discharge all the duties which he assumed, and which, by reason of his employment, plaintiff was justified in calling upon him to perform.  He was not dealing with ignorant men—men unacquainted with science and books.  Though they were not, perhaps, skilled in this particular line of science, they were skilled in the way of the schools.  This plaintiff has permitted him to act in the capacity of expert engineer during all these years. After he had severed his connection under this contract, he was re-employed by the directors of this company, following methods which the company itself had adopted in the management of its business.  The record fails in any place to show that he did not respond willingly and fully to any service which the corporation called upon him to perform, in the line of his employment.  Not all the sins of omission and commission of this corporation ought to be laid upon this defendant.

Nowhere in plaintiff's petition is it urged that its act in issuing this stock was *ultra vires*.  Nowhere is it claimed that it was not authorized to issue the stock in pursuance of the contract made.  Such issues were not tendered.    It predicates its right to cancel this stock upon the fact alone that the defendant misrepresented his qualifications to the promotors of this concern, and on that theory alone.   There is no claim that he did not perform the services fully called for by his contract.  No such issue was tendered.  It is not claimed that he did not earn the $5,000 represented by the stock, assuming that he was capable and qualified to discharge the duties of an expert mineralogist.  The right of the corporation to enter into the contract, the right of the corporation, as such, to issue the stock, in consideration of performance of the conditions of the contract, is not questioned in any pleading.  The right to cancel the contract—if any right exists in this suit—must rest upon the allegations made in the petition upon which the right is predicated.  The

services contracted for have been performed. The contract on the part of the plaintiff has been executed. The plaintiff cannot repudiate it at this time. See *Church v. Johnson Bros.*, 93 Iowa 544; *Lucas v. White Line Trans. Co.*, 70 Iowa 541; *Fidelity Ins. Co. v. German Sav. Bank*, 127 Iowa 591. Plaintiff has received and is holding the consideration for which this stock was issued. It has shown no legal or equitable ground upon which it is entitled to the relief prayed for. We think the court erred in finding for the plaintiff, and its action is—*Reversed*.

WEAVER, C. J., LADD and STEVENS, JJ., concur.